UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

                                    Case No. 19-cr-20245
                    Plaintiff,

vs.                                 HON. GERSHWIN A. DRAIN

JEROME WATSON,

                    Defendant.

_____/

GOVENRMENT'S RESPONSE AND BRIEF
IN OPPOSITION TO DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE (ECF No. 23)

## INTRODUCTION AND PROCEDURAL POSTURE

On February 4, 2020, this Court sentenced Jerome Watson, age

39, to serve 18 months on one count of bank fraud, with a mandatory

consecutive sentence of 24 months for aggravated identity theft, arising

from his 2015 activities with a loosely-knit group dubbed the "felony

lane gang" (FLG) by the banking industry.  As of October 16, 2020,

Watson has served 19 months of the total 42 month sentence. He is

currently housed at FCI Butner Medium II where, as of October 13,

2020, in a population of 1,412 total inmates, three inmates and zero

staff members have active cases, and another nine inmates and two

staff members have contracted the virus and recovered.

https://www.bop.gov/locations/institutions/btf/; https://www.bop.gov/
coronavirus/. No deaths of any inmates or staff at that facility due to
Covid-19 have been reported. (*Id.*). Watson, who is obese (BMI of 34.9),
sent a letter to this Court dated May 14, 2020 expressing concern about
his health as well as his family due to what can be viewed as
extraordinary changes in his family circumstances all due to the Covid-
19 Pandemic. (ECF No. 23: PageID.154). The Court construed the letter
as a motion for compassionate release, appointed counsel, and set a
briefing schedule. Because Watson sought release from the warden
more than 30 days ago, exhaustion of administrative remedies, the first
criterion for relief, is not an issue. In addition, because Watson has a
verified medical condition identified by the CDC to place him at high
risk for severe complications should he contract Covid-19, the
government concedes that he has established an extraordinary
circumstance, the second criterion for eligibility.  The government also
concedes that, despite a substantial criminal history in and before 2015,
Watson has shown that he is not a danger to the community through
his post-offense rehabilitative efforts, including his nearly-completed

apprenticeship and the gainful employment that awaits him, as well as his care for his two minor children and future stepson who is profoundly disabled, thus satisfying the third criterion for compassionate release. However, the United States submits that application of the sentencing factors under 18 U.S.C. § 3553(a), particularly those relating to the seriousness of the offense (§ 3553(a)(2)(A)) and the need to avoid unwarranted sentencing disparities among defendants (§ 3553(a)(6)) prevents it from consenting to the relief Watson requests.

## ARGUMENT

### 1. The Bureau of Prisons is Addressing Covid-19.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if

performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic.

Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7784 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As of August 7, 2020, at least 116 Eastern District of Michigan defendants have been released into home confinement. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy

solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid

the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and

circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release. Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of

Prisons."). In this case, the Bureau of Prisons advises that Watson's "pattern score," generated from his extensive criminal history, makes home confinement essentially unattainable.

### 2. Even though Watson has satisfied the exhaustion requirement, has a medical condition (obesity) which qualifies as a "extraordinary and compelling reason" for compassionate release, and would be unlikely to pose a danger to the community if released, his motion should be denied because the 18 U.S.C. § 3553(a) factors weigh against release.

In order to qualify for compassionate release, a federal prisoner must satisfy four criteria. First, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). This statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36. Here, Watson waited 30 days from when his warden received his request to file the present motion, and has therefore satisfied the first criterion.

10

Second, a prisoner must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1.  Here, medical records obtained from the Bureau of Prisons establish that Watson is clinically obese, with a body mass index (BMI) of 34.9.  Any BMI of 30 or more is classified as obese. The CDC has recognized that obesity is a Covid-19 risk factor. Thus, Watson has satisfied this criterion.

Third, to qualify for compassionate release, a prisoner must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).  This is admittedly a difficult issue requiring, in the final analysis, a prediction about future human behavior.  On the one hand is Watson's criminal history and his offense conduct here. Watson is 40

years old.  Before he was 35, Watson accumulated nine adult convictions, at least two juvenile adjudications, numerous other arrests, and engaged in the crimes leading to these federal criminal convictions, crimes that involved property damage, theft, fraud and endangering the safety of others by his involvement in a high speed police chase. (PSR, ¶¶34-60, 16). While six of the adult convictions noted in the PSR involved non-violent misdemeanors (including two traffic-related offenses and one possession of marijuana conviction), his history also includes robbery (at age 15), maliciously destroying property by throwing bricks at a car whose owner had an altercation with Watson's friend (at age 27), and various convictions relating to the use of false identification. (*Id.*). In addition to the robbery noted above, his juvenile adjudications include aggravated battery, burglary, and aggravated battery/robbery on a pregnant woman (at age 17). (PSR ¶65).

Watson's criminal history alone would ordinarily compel the government to argue that Watson would pose a danger to the community if released.  But, as this Court explored at the time of sentencing, there is more to Watson than his criminal history reveals.

Specifically, Watson's post offense/pre-arrest conduct may be a better predictor of Watson's future conduct. In that period of approximately four years, Watson's lifestyle dramatically changed. He completed three years of a four-year apprenticeship in plumbing prior to his arrest in this case. (PSR ¶ 75). During that same period, he was employed as a full time plumber and appliance repairman, and earned rave reviews from his employer, who wrote the court at the time of sentencing, and again in support of this motion, that they are eager to have Watson back. (PSR ¶ 78; ECF No.33, Exhibit 7, PageID.217 (Letter from Robert Pollina)). He had no arrests, save for this case, since 2015, and has had no disciplinary issues while incarcerated. According to his fiance, Watson was devoted to family and was a caregiver to her 18-year-old, profoundly disabled son from a previous relationship, as well as their own two children. (PSR ¶ 63; ECF No.33, Exhibit 3, PageID.209 (Letter from Tandrell Ashley)). There can, of course, be no certainty relative to Watson's future behavior. But, based on his post-offense conduct, the government believes that Watson would no longer pose a danger to the community if released. If the Court agrees, Watson has met the third criterion for compassionate release.

But, fourth, a district court may not grant a motion for compassionate release to an otherwise eligible prisoner unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) to determine whether release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). As at sentencing, those factors require the district court to consider, among other things, the

defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, the protection of the public, the applicable sentencing guideline range and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).  This is where Watson's motion falters.

The 18 U.S.C. § 3553(a) factors were discussed in the government's sentencing memorandum in this case, and have not significantly changed. (ECF No. 19, PageID.87 (Government's Sentencing Memorandum at 7-16)). The applicable aggregate guideline range was 51-57 months. (*Id.* at 7, PageID.87; PSR ¶¶ 84-85). The offenses were planned, extensive, numerous, involved multiple non-institutional victims as well as banks, and involved reckless conduct endangering the public. (ECF No. 19, PageID.88 (Government's Sentencing Memorandum at 8-12); PSR ¶¶ 11-20). The offenses were, therefore, quite serious. Watson's criminal background is summarized above. If the sentence is reduced to something less than 20 months (the effect of compassionate release now), the sentence would be insufficient to promote respect for the law, provide just punishment, or further general

deterrence. In addition, when compared to the guideline range in this case, and the sentences imposed on other FLG defendants, a sentence reduction would also undermine the need to avoid unwarranted sentencing disparities. Indeed, the only sentencing factors that favor Watson are the need to protect the public and the need for specific deterrence, assuming the Court believes that he is no longer a danger to the community. Because the sentencing factors enumerated in 18 U.S.C. § 3553(a) do not support release, Watson's motion should be denied.

### 3. If the Court were to grant Watson's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Watson's motion despite the government's argument above, the Court should order that he be

subjected to a 14-day quarantine before release.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Craig A. Weier*
CRAIG A. WEIER (P33261)
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9678
craig.weier@usdoj.gov

October 16, 2020

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2020, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF.

*s/Craig A. Weier*
CRAIG A. WEIER (P33261)
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9678
craig.weier@usdoj.gov